Walt PATTERSON, in His Official Capacity as Director of
the Department of Human Services; and Department of
Human Services *v*. R.T., et al.

89-64                                                 784 S.W.2d 777

Supreme Court of Arkansas
Opinion delivered February 26, 1990

*Debby Thetford Nye*, General Counsel, and *Breck G.
Hopkins*, Deputy General Counsel, Department of Human
Services, for appellants.

*Griffin J. Stockley* and *Jeanette Whatley*, Central Arkansas
Legal Services; and *Brian Wolfman*, Legal Service of Arkansas,
for appellees.

JACK HOLT, JR., Chief Justice. This appeal focuses on a
question concerning disqualification of the presiding chancellor.
We find that she should have recused from this case; thus, we
reverse and remand.

The appellees, four adults, individually and as parents and
next friends of six minors, filed this class action suit in equity

pursuant to 42 U.S.C. § 1983 (1982) on behalf of:

> Themselves and all parents, guardians, and custodians whose children have been found by a court of competent jurisdiction to be dependent/neglected or abused and have been placed in the custody of a relative or other person or institution, but who have not been placed in a state-approved foster care program, and who are not receiving the statutorily mandated services to reunite the family.

The appellees alleged below that appellants, the Department of Human Services and Walt Patterson, Director of the Department, had failed to provide the same reunification services to the members of the class that are provided to parents, guardians, or custodians and their children where the children have been placed in state-approved foster care, thereby violating the Arkansas Juvenile Code of 1975 [Ark. Code Ann. §§ 9-27-301—9-27-367 (1987)] and the due process and equal protection clauses of the fourteenth amendment. They asked for declaratory relief stating that appellants' failure to provide them with reunification services mandated by the Juvenile Code violated their statutory and constitutional rights and for injunctive relief requiring the appellants to provide services and to amend their policies.

When this action was filed, it was assigned to the First Division of the Pulaski County Chancery Court. The case was transferred to the Third Division to be heard by the Honorable Judith Rogers. Shortly thereafter, appellants filed a motion for an order of recusal asking that the chancellor disqualify herself. The motion was denied.

After numerous hearings and several amendments to the pleadings, an agreement was reached by the parties as to a new definition of the class, and the chancellor entered an order accordingly. However, the chancellor, in her decision on the merits, established a new class as follows:

> All parents, guardians, or custodians and their children who, since July 1, 1985, have been involved in judicial proceedings [where the Department of Human Services or its agents (including SCAN) has been a party] in which a finding of dependency/neglect or sexual abuse has been entered and has resulted in placement of the child(ren)

with a relative, or other person or institution, and who are not receiving or will not receive in the future the same services to reunite the family which are being provided to families and their children who have been placed in a state-approved foster care, and who are not receiving permanency planning service and periodic reviews in those situations where reunification is not possible.

In this decision, the chancellor found that the appellees' equal protection, due process, and statutory claims had merit and ordered the appellants to provide the same services to class members as are provided to families and children where the children have been placed in state-approved foster care and to amend their policies to conform to the order of the court. In addition, the chancellor ordered the appellants to establish an implementation process for reunification services. From this order, appellants appeal.

For reversal, appellants contend that the chancellor erred in refusing to recuse. We agree. Appellants make six additional arguments on appeal; however, we do not address them inasmuch as the issues in the case may be different on remand.

■ "A judge must avoid impropriety and appearance of impropriety." Arkansas Code of Judicial Conduct Commentary to Canon 2 (1988). Accordingly, "[a] judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . . ." Arkansas Code of Judicial Conduct Canon 3(C)(1) (1988).

■ Where a judge exhibits bias or the appearance of bias, this court will reverse. *Burrows* v. *City of Forrest City*, 260 Ark. 712, 543 S.W.2d 488 (1976); *Farley* v. *Jester*, 257 Ark. 686, 520 S.W.2d 200 (1975). "[T]he proper administration of the law requires not only that judges refrain from actual bias, but also that they avoid all appearances of unfairness." *Bolden* v. *State*, 262 Ark. 718, 561 S.W.2d 281 (1978).

In *Farley, supra,* the chancellor made a statement during trial, which reasonably could have been understood by the litigants as an implication that the testimony of one witness would receive more consideration than the testimony of other witnesses. In holding that the chancellor should have disqualified himself,

we stated:

> [C]ourt proceedings must not only be fair and impartial—they must appear to be fair and impartial. This factor is mentioned in a Comment found in 71 Michigan Law Review 538, entitled, "Disqualification of Interest of Lower Federal Court Judges: 28 U.S.C. § 455", as follows:
>
>> "Another factor to be considered in a judge's decision to disqualify is the contention that the appearance of impartiality is as important, if not more so, than actual impartiality. In 1952, Justice Frankfurter explained his disqualification in a case by stating that 'justice should reasonably appear to be disinterested as well as be so in fact.' . . . More recently the Court set aside an arbitration award and stated that '(a)ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias.' "
>
> Likewise, in the Code of Judicial Conduct, prepared by the Special Committee on Standards of Judicial Conduct of the American Bar Association, and adopted by this court by *Per Curiam* Order of November 5, 1973, the Commentary to Canon 2 points out that not only must a judge avoid all impropriety, but must avoid also any appearance of impropriety.

In appellants' motion to recuse and brief in support thereof, they alleged that Chancellor Rogers should recuse inasmuch as she is an active member of the Permanency Planning Task Force sponsored by the National Council of Juvenile and Family Court Judges, "an advocacy group which has taken public positions with respect to the policy questions which are subject of this litigation" and supported and participated in the drafting of Act 868 of 1985. They also claimed that she should recuse because she has provided services to the Juvenile Justice Commission and, as a result, "will participate in proposals regarding a number of policy questions which could be a matter of litigation in this case."

In response, appellees admitted the chancellor's membership in the Permanency Planning Task Force, but denied that the Task Force supported and drafted Act 868 of 1985.

Chancellor Rogers, in her order denying the appellants' motion for recusal, acknowledged membership on the Permanency Planning Task Force and the Juvenile Justice Commission, and noted that the Task Force is not an advocacy group; that it has not issued any advisory opinions dealing with the relief sought by the plaintiffs; that the Juvenile Justice Commission has not discussed the type of case presently involved; that she possesses no knowledge of disputed evidentiary facts to warrant recusal; and that her membership on the committees in question does not affect her impartiality.

■ The chancellor's membership on the Juvenile Justice Commission and the Permanency Planning Task Force does not automatically require disqualification, nor do we find that any bias necessarily resulted from the chancellor's membership and participation in these organizations. However, her identification with these organizations, coupled with her conduct and comments during pretrial proceedings and at trial, exhibited the appearance of bias. In short, she should have recused.

During a hearing on a motion for class certification, the chancellor, in response to cross-examination of appellees' expert witness, Amy Rossi, concerning Rossi's position on whether home placement should trigger intervention by the state, remarked: "I want to make a statement, since I've looked at the definition of an expert, I'm going to say I'm pretty much an expert in this area. . . ."

Later in this hearing, the following exchange between the chancellor and appellees' expert witness, JoAnn Nash, took place during direct examination:

> Mr. Stockley (appellees' counsel): Ms. Nash, were you employed by me to review some case files?
>
> Ms. Nash: Yes.
>
> . . .
>
> The Court: You say, "Unlike foster case, it was frequently noted in cases where children were placed with relatives that it was the agency's goal to close the case without attempts for reunification and without permanency planning for the child."

Ms. Nash: Yes, Judge Rogers.

The Court: Did it say on it, "the goal is to close without attempts for"—or what was the wording that you got that?

Ms. Nash: No, the wording would say that it was the agency's goal to close the case due to relative placement.

. . .

Ms. Nash: Can I refer to a particular example —

. . .

The Court: Sure. Well, pull one out that says, "even in those instances when it was the opinion of the agency that reunification was not possible and/or desirable, no permanency planning assistance was provided even though requested by the relative." Do you have one of those?

Ms. Nash: Yes.

The Court: Good, let's pull that one.

From this scenario it is obvious to this court that the chancellor, during the early stages of the trial proceedings, communicated the appearance of bias to the litigants by declaring that she was an expert and then directing the appellees' witness to furnish the court with certain types of case files that would bolster the appellees' allegations.

In examining another pretrial proceeding on appellants' motion to dismiss, we find further comments by the chancellor that provided a basis for the litigants to reasonably question her disinterest:

Mr. Stockley: Even — if I could make one comment because I need to be clear on this myself. Even if all these cases got resolved before trial date, we still have a class that has been certified that is entitled to —

The Court: Some relief.

Mr. Stockley: — to the relief or no relief. I mean —

The Court: Yeah, I agree with that.

Ms. Nye (appellants' counsel): Your honor, I disagree with

that. If there — there's a continuing responsibility to keep the class definition alive and if at a point in time we come to trial —

The Court: Well now, wait a second, wait a second. Suppose you go ahead and deliver services to all these people but we haven't changed the system, which is really what the plaintiffs are caring about, and which is what this court cares about . . . .

Ms. Nye: Certainly and that is to my point on the declaratory aspect of it, being a legal issue with respect to the treatment of the remaining class definition.

The Court: It's certainly a legal issue as respect to whether or not people get damages and their 1983 things, but whether or not we go ahead and set guidelines for future action because we have seen it happen over and over and over again by members of a class, I think that's a little different. Then I think the court can go ahead and do that and the court's going to do that. I know it's very difficult but I'm going to do it. We may sit here between now and the 29th or 30th, but we're going to get—we're going to go ahead and see that not only these individually named plaintiffs are given services, but that we set up some sort of system, by agreement or court order which is then appealable, to say that we will not do this to children. . . .

The mind-set of the chancellor is apparent to us. By commenting, "Suppose you [appellants] go ahead and deliver services to all these people, which is really what the plaintiffs [appellees] are caring about, and what this court cares about . . . ," the chancellor has declared before trial that the appellees are entitled to receive services before she had heard any evidence on the merits concerning their entitlement to services. She further exhibited the appearance of bias when she stated that "we're going to go ahead and see not only these individually named plaintiffs are given services, but that we set up some sort of system, by agreement or *court order* . . . ." [Emphasis added.]

The chancellor's involvement had obviously gone beyond objectivity, and the court seemed to be announcing the outcome of the case before it was tried. The tone of the court's remarks was

administrative in nature and not judicial.

Likewise, the chancellor's remarks during trial provided cause for the litigants to reasonably question her impartiality. For example, during the testimony of Ms. Rossi, the first witness called by the appellees, the chancellor commented, "— you know, I don't think Ms. Rossi will have any real trouble finding a case or you [Mr. Stockley] should have — be able to give it to her and and say, "Was this one of the cases you found and on that basis did you go ahead? Do you remember any case that you found that said it didn't provide services, could you go through your cases and find it?"

In addition, the chancellor, in response to a request by one of the attorneys, stated: "Yes you may inquire. Counsel if you think that my patience is short, it is not because my patience is short on this particular case, it is because I have been dealing with this system for eleven years and although I do see an improvement, *I do not see enough of an improvement . . . .*" [Emphasis added.] Later, the chancellor expressed appreciation of appellee's witness, Ms. Nash, acknowledging that Nash's testimony made it easier for her [the chancellor] to "make some sense out of *what I wanted to do . . . .*" [Emphasis added.]

In the chancellor's findings of fact and conclusions of law, she gave effect to her earlier remarks by ordering appellants to provide services to the appellees and to change their system by amending their policies to conform to her order.

Of course, a judge trying a case without a jury may develop "bias" as the trial progresses, and that "bias" ultimately may result in the court's judgment. It is, however, the communication of that bias at inappropriate times and in inappropriate ways that will cause us to reverse. That is what has happened in this case. While we suggest no knowing violation or intentional misconduct on the part of the chancellor, we reverse this decision because it was so tainted by the appearance of prejudgment.

As Justice Black stated for United States Supreme Court in *In Re Murchison*, 349 U.S. 133 (1955), "[T]o perform its high function in the best way 'justice must satisfy the appearance of justice.'"

Reversed and Remanded.

HAYS, J., dissents.

GLAZE, J., not participating.

STEELE HAYS, Justice, dissenting. I do not share the view of the majority that the appellants have shown such prejudice by the trial judge that an appellate court can conclude the chancellor should have recused from the case. This was a long, involved trial with complex issues, including class certification, yet the majority offers only subjective interpretation of isolated excerpts from a voluminous record to sustain its position. In their strongest sense, these segments fall considerably short, I believe, of the sort of "objective, demonstrable prejudice" which our cases require. *Matthews* v. *Rodgers*, 279 Ark. 328, 651 S.W.2d 453 (1983). In their weakest sense, they are merely ambiguous. Nor is it unusual for trial judges to express tentative views on the merits of a case from the moment they have read the pleadings. Those are not indicative of a prejudice that taints a trial.

We have said, correctly I submit, that recusal is a matter which *must be left largely to the discretion of the trial judge. Sloss* v. *Farmers Bank & Trust Co.*, 290 Ark. 304, 719 S.W.2d 273 (1986); *Narisi* v. *Narisi*, 229 Ark. 1059, 320 S.W.2d 757 (1959). If that language of the law is to have any meaning, the appellants should not prevail on this contention. I would affirm.